UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
UNITED STATES OF AMERICA,                         :
                                                  :
                                                  :
                                                  :
                -against-                         :   1:18-CR-26-ALC-2
                                                  :
                                                  :   <u>**ORDER**</u>
REDHWAN SALEH,                                    :
                                                  :
                        Defendant.                :
                                                  :
                                                  :
                                                  :
---------------------------------------------------------------- :
                                                  :
                                                  x

**ANDREW L. CARTER, JR., District Judge:**

Petitioner Redhwan Saleh ("Petitioner" or "Saleh"), proceeding *pro se*, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 (the "Petition"), challenging his 2018 conviction for one count of arson, in violation of Title 18, United States Code, Section 844(i), and one count of conspiracy to commit arson, in violation of Title 18, United States Code, Section 371. Petitioner principally argues that he received ineffective assistance from his counsel. For the reasons set forth below, the petition for writ of habeas corpus is DENIED.

**BACKGROUND**

*Evidence Presented at Trial*

The government's opposition to Saleh's habeas petition provides a concise summary of the evidence presented at trial. *See* ECF No. 147 at 1-6. Saleh was charged with hiring three men to set fire to a new deli that was about to open down the street from a deli that Saleh owned.

1

The government's evidence included "testimony [from] a cooperating witness (one of the arsonists), law enforcement officers, the owner of the new deli; phone records; and physical evidence from the scene of the fire." *Id.* at 1-2. According to the Government's case, Saleh was "worried about the competition" from the new deli and reached out to his friend Richard Sanchez to "find me someone to set fire to that new deli, and I'll pay them, and I'll pay you." Trial Transcript ("Tr."), 21:22-22:9. Saleh's business partner testified that Saleh was worried the new deli was "the same business" and would be "some kind of competition" to their deli. Tr. 311:24-25.

One of the arsonists that Saleh hired, Arthur Cherry, testified at trial. Cherry testified that Richard Sanchez approached him about the arson plot, stating that Saleh "had an issue with a new deli owner" and that Saleh was "willing to pay for somebody to do some type of damage to the store," such as "a small fire or something to make him reconsider, you know, opening up the store." Tr. 175:18-176:6. Saleh offered $2000 or $3000 dollars to Sanchez and Cherry. Tr. 179:2-4. Cherry then recruited his friend Antoine Bostick to help with the plan. Tr. 181:1-16. After a trip to case the area around the new deli, Sanchez, Bostick, and Cherry went by Saleh's deli. Sanchez introduced Bostick and Cherry as "the guys that were going to take care of the situation," and Saleh responded "okay." Tr. 187:22-188.

It took two attempts to set the blaze at the new deli. On the first attempt, Bostick poured gasoline on the roof of the new deli, ignited it, and ran away. Tr. 197:11-16. During this attempt, Bostick left the container he'd used to pour the gasoline on the roof. Tr.198:9-11. However, the fire did not cause much damage, because "the roof was fire proofed" and "the fire went right out." Tr. 198:20-22. Saleh refused to pay because the damage was not done, and in order to ensure the success of the second attempt, he went onto the roof of his own deli to show Sanchez

2

and Cherry his preferred method of starting the fire: the arsonists should pour gasoline down the ventilation pipe of the new deli before setting it alight. Tr. 199:1-200:1. On the night of September 11th, 2016, Bostick and Cherry returned to the roof of the new deli. After Bostick poured the gas and lit the fire, there was a loud boom and explosion that threw Bostick back. Tr. 208:8-11. Cherry and Bostick then ran to Sanchez's apartment and drove away right as the fire department arrived at the new deli. Tr. 208:12-14; 209:1-11. The following day, Cherry called Saleh multiple times to find out when Saleh would pay him. Tr. 211:7-16. Later that week, Cherry and Sanchez met Saleh at a park bench in Van Cortlandt Park, where Saleh gave them an envelope of cash. Tr. 212:2-18.

    The government introduced phone records that further bolstered their case. The records showed that Cherry and Saleh communicated with each other multiple times following the arson, even though they had never communicated by phone before that date. Tr.337:8-339:4. The records also showed that around the time of the arson, Cherry and Saleh were both communicating with co-conspirator Richard Sanchez. Tr. 335:5-337:7.

    In addition, the government called a New York City Fire Department ("FDNY") member that testified that he discovered a plastic container with some gasoline left in the bottom and the nozzle of a gas can near the vent pipe on the roof of the new deli. Tr. 153:9-19. The trial also included testimony from a detective with the New York City Police Department ("NYPD") who described Saleh's suspicious conduct after the fire. The detective testified that when he showed Saleh a picture of Cherry and Bostick, he avoided eye contact and said he did not recognize either man. Tr. 422:6-20. Several months later, the detective interviewed Saleh again and showed him a picture of Cherry. This time, Saleh – who was fidgeting in his seat, would not make eye

3

contact with the detective, and generally seemed nervous – stated that he did recognize Cherry from the picture. Tr. 427:5-23.

*Saleh's Defense*

      Saleh was represented at trial by two attorneys, Mario Romano and Arthur L. Aidala. Saleh's counsel conducted thorough cross examination of the Government's witnesses. *See, e.g.,* Tr. 83-119 (cross examination of new deli owner), Tr. 220-306 (cross examination of Cherry), 342-352 (cross examination of phone records analyst), 442-502 (cross examination of NYPD detective). Trial counsel used cross examination to challenge the credibility of the Government's witnesses, with a particular focus on the credibility of Cherry. The lengthy cross examination of Cherry included questions about his criminal history (Tr. 221-234), prior inconsistent statements he made to law enforcement (Tr. 235, 242-44, 258-60), and his drug use at the time of the arson (Tr. 269). Saleh's counsel also used cross examination to elicit affirmative facts. For example, on cross examination, defense counsel raised the possibility of an alternative perpetrator by asking the new deli owner about a dispute he had with a food truck vendor (Tr. 115-116), and defense counsel established through Cherry that there were a number of competing businesses on the block, other than Saleh's deli. Tr. 266.

      After the government rested, Saleh's counsel informed the Court that they did not intend to offer any evidence. The Court then allocated the defendant on his right to testify, and he declined in the following exchange:

    THE COURT: All right. Mr. Saleh, do you understand, sir, that you have the right to take the stand and testify in your own defense in this case?

    DEFENDANT SALEH: Yes.

>THE COURT: And have you discussed with your attorneys whether you wish to testify in this case?
>
>DEFENDANT SALEH: Yes.
>
>THE COURT: And have you reached a decision, sir, after conferring with your attorneys as to whether or not you want to testify in this case?
>
>DEFENDANT SALEH: No.
>
>THE COURT: Have you reached a decision?
>
>DEFENDANT SALEH: Yeah. I want—no.
>
>THE COURT: You need to speak up.
>
>DEFENDANT SALEH: No.
>
>THE COURT: Do you wish to testify in this case?
>
>DEFENDANT SALEH: No.
>
>THE COURT: Very well. You can be seated.

Tr. 526:7-24.

In closing arguments, trial counsel noted that Richard Sanchez had not testified. The defense argued that the jury could not convict without hearing directly from Sanchez himself, because it was Sanchez who told Cherry that Saleh wanted the arson in the first place. Instead of hearing directly from Sanchez, the jury had heard only Cherry's hearsay testimony about what Sanchez told him. Tr. 588-89. In addition, defense counsel argued that Cherry's testimony was not credible because it was secondhand from Sanchez, and because Cherry was an unreliable witness. Tr. 589, 590-94, 596-601. Defense counsel further argued that there was no forensic evidence, such as fingerprints or DNA, connecting Saleh to the arson, which put even greater emphasis on Cherry's credibility. Tr. 591.

5

*Verdict, Sentence, and Direct Appeal*

On November 9, 2018, the jury returned a unanimous guilty verdict on both counts with respect to Saleh. ECF No. 77. At the conclusion of trial, Judge William H. Pauley, III noted on the record that "[t]he case was very professionally tried and all defense counsel, in my view, gave it their very best in the highest traditions of advocacy in this court." Tr. 723. On June 20, 2019, Saleh was sentenced to 63 months incarceration, followed by 3 years of post-release supervision, and a restitution of $50,000. ECF No. 126.

On July 1, 2019, Saleh appealed his case to the Second Circuit. He raised three primary arguments on appeal: (1) that the Court had erred in admitting certain co-conspirator statements Sanchez had made to Cherry; (2) that the evidence was not sufficient to support the finding that Saleh had conspired to commit arson and committed arson; and (3) that the evidence was not sufficient to support the finding that setting fire to an unopened deli satisfied the federal nexus. On May 20, 2020, the Second Circuit issued an order and judgment rejecting these arguments. The Second Circuit affirmed the judgment of the District Court on June 11, 2020. ECF No. 136, *United States v. Saleh*, 813 Fed. Appx. 678 (2d Cir. 2020).

*Saleh's Habeas Petition*

Thereafter, petitioner filed a timely *pro se* habeas petition on December 11, 2020 (ECF No. 143), with a supplemental habeas petition filed on March 31, 2021 (ECF No. 148).

The petition at ECF No. 143, construed with the liberality afforded *pro se* filings, raises three arguments for Saleh's ineffective assistance of counsel claims, which all grow out of his defense counsel's trial strategy. First, Saleh claims that his counsel was ineffective for advising him not to testify in his own defense. Second, Saleh claims his counsel was ineffective for not

calling Richard Sanchez as a witness. Third, Saleh claims that his counsel was ineffective because they did not present an affirmative defense and rested at the conclusion of the government's case. Saleh argues that defense counsel should have introduced testimony that he was only a partial owner of his deli, instead of a full owner.

The petition at ECF No. 148, construed with the liberality afforded *pro se* filings, appears to challenge his conviction on the basis of "new found evidence". The "new found evidence" appears to primarily be the United States Constitution, the Articles of Confederation, and an Affidavit from Saleh denying his guilt. The "new found evidence" does not include new physical evidence or testimony related to his case.

## LEGAL STANDARD

28 U.S.C. § 2255 allows a person convicted in federal court to "move the court which imposed the sentence to vacate, set aside or correct the sentence" on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack...." 28 U.S.C. § 2255(a). Under § 2255, a court may grant relief "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (quoting *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)) (internal quotation marks omitted); *see also* 28 U.S.C. § 2255.

When considering a § 2255 motion, a district court must hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no

relief...." 28 U.S.C. § 2255(b). "However, the filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing; that section does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible.'" *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). "To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief." *Id.* at 131. If it "plainly appears" from the motion, exhibits, and record of prior proceedings that the habeas petitioner is not entitled to relief, "the judge must dismiss the motion." Rules Governing § 2255 Proceedings for the United States District Courts, Rule 4(b), 28 U.S.C. § 2255.

Finally, in ruling on a § 2255 motion, "the so-called mandate rule bars re-litigation of issues already decided on direct appeal" and "prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010). Further, the Court construes a *pro se* petitioner's submissions liberally and interprets them "to raise the strongest arguments that they suggest." *Fulton v. Goord*, 591 F.3d 37, 43 (2d. Cir. 2009) (quoting *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001)) (internal quotation marks omitted).

To prevail on an ineffective assistance claim, petitioner must demonstrate that (1) his counsel's performance "fell below an objective standard of reasonableness" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688-694 (1984). As the Second Circuit has stated, "[t]his test presents a high bar for a defendant, as *Strickland* instructs

8

courts to apply a 'presumption of effective performance.'" *United States v. Nolan*, 956 F.3d 71, 79 (2d Cir. 2020). Further, "The standard of *Strickland* 'is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on [it].'" *Id.* (quoting *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (alteration in original) (quoting *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001)).

For the first prong of an ineffective assistance claim, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance," *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005), because courts recognize "that counsel must have 'wide latitude' in making tactical decisions." *Id.* For this reason, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," and "even strategic choices made after less than complete investigation do not amount to ineffective assistance—so long as the known facts made it reasonable to believe that further investigation was unnecessary." *Id.*

For the second prong of an ineffective assistance claim, petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner "must show more than that the unprofessional performance merely 'had some conceivable effect.'" *Henry*, 409 F.3d at 63 (quoting *Strickland*, 466 U.S. at 693). "[R]easonable probability [is] one that undermines confidence in the outcome." *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006). If a defendant

9

fails to show prejudice, the Court "need not consider the objective reasonableness of counsel's actions." *United States v. Guang*, 511 F.3d 110, 120 (2d Cir. 2007).

In regard to the decision to testify, the right to testify is personal to the defendant and may not be waived by his attorney over the defense's objection. *See Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997); *Chang v. United States*, 250 F.3d 79, 83 (2d Cir. 2001) ("[R]egardless of strategic considerations that his lawyer concludes weigh against such a decision, a defendant who wishes to testify must be permitted to do so."). The "burden of ensuring that the defendant is informed of the nature and existence of the right to testify is a component of the effective assistance of counsel." *Chang*, 250 F.3d at 82. To establish a claim of ineffective assistance of counsel based on a violation of his right to testify, a defendant must satisfy the two-pronged *Strickland* test, including showing a reasonable probability that his testimony "would have altered the outcome at trial." *Rega v. United States*, 263 F.3d 18, 21 (2d Cir. 2001).

Finally, a challenge based on new evidence "must be supported by cause for the defendant's failure to raise his claim earlier," which can be established by showing that the claim is based on "newly discovered evidence that could not reasonably have been discovered before trial." *United States v. Helmsley*, 985 F.2d 1202, 1206 (2d Cir. 1993).

**DISCUSSION**

As a general matter, the Court views Petitioner's filing of an additional habeas petition at ECF No. 148 while his petition at ECF No. 143 was already pending in the district court as a motion to amend the petition at ECF No. 143. *Ching v. United States*, 298 F.3d 174, 177 (2d Cir. 2002) (holding that to be successive, a Section 2255 motion "must at a minimum be filed subsequent to the conclusion of a proceeding that 'counts' as the first").

*Trial counsel presented a reasonable defense*

Saleh claims that his counsel "fail[ed] to present a complete defense." ECF No. 143, at 6. Saleh's claim is generally centered on his counsel's decision not to call any witnesses, and its decision to rest at the close of the government's case. "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance," *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005), because courts recognize "that counsel must have 'wide latitude' in making tactical decisions." *Id.* The strategy that trial counsel pursued falls well within the 'wide latitude' granted to a lawyer's decision making.

As noted in the declaration from Saleh's trial counsel at ECF No. 162, "[a]ll of the Government's witnesses were cross examined" revealing "many prior inconsistent statements of government witnesses"; the credibility of witness Cherry was "strongly questioned" due to prior inconsistent statements and his criminal record; and the owner of the new deli was questioned about a dispute with a vendor, who could have been an alternative perpetrator of the arson. ("Trial Counsel Decl.") at ¶ 8. Trial counsel also cross examined the phone analyst and the NYPD detective. *Id.* Each of these tactics could lead the jury to doubt the government's evidence and the witnesses that they put on, and thus could have planted the seed of a reasonable doubt in their minds.

Further, it is unclear that some of the evidence that Saleh wanted to present would have helped his case. For example, Saleh argues that his counsel should have told the jury that he was only a 25% shareholder in the deli, which could lead the jury to conclude that he had "no motive" for arson. ECF No. 143, at 21. Saleh was originally going to testify about his ownership stake while he was on the stand, but ultimately decided not to testify at trial. Trial Counsel Decl. ¶ 14. Applying the *Strickland* factors, it is objectively reasonable for counsel not to introduce this

fact, as the size of Saleh's ownership stake does not diminish his potential motive to stop a new competitor. Lastly, it is unlikely that this testimony would have altered the jury's decision. If the jury agreed with the government that Saleh was motivated by a desire to stop a new competitor, learning that he was only a partial owner is unlikely to change this calculus.

*Saleh chose not to testify, and his testimony is unlikely to have changed the outcome at trial*

Saleh claims that his counsel advised him not to testify. ECF No. 143, at 7. Saleh claims in a declaration that his trial counsel informed him "there was no need" for him to testify because they were "certain that we [had] won." ECF No. 143, at 43. However, Saleh's trial counsel disagree with this characterization of events. According to trial counsel, "[w]e both met with client many times" and discussed Saleh's right to testify on more than ten occasions. Trial Counsel Decl. ¶ 10. "Many hours were spent preparing" for Saleh's testimony, and it was "Saleh's decision alone to decide not to testify." *Id.* Saleh stated to his counsel that he was "afraid to testify," and when he was asked by Judge Pauley to do so, he declined. *Id.*; Tr. 526:7-24. Further, trial counsel stated that "at no time did [either attorney] ever express to Saleh that he did not need to testify because he had won." Trial Counsel Decl. ¶ 10.

As shown by the record, Saleh's petition, and the submissions from trial counsel, Saleh was properly advised of his right to testify. It was Saleh's decision alone not to testify. Even assuming in the alternative that Saleh chose not to testify on the basis of trial counsel's recommendation (a fact that they dispute), this is not outside of the reasonable range of trial strategy. There are many good reasons for Saleh *not* to take the stand, including what may have been difficult questions about his interactions with the NYPD, cross examination about his phone records, and the need to respond directly to Cherry's testimony that Saleh directed the others in

how best to start the fire. Once again, it is also unlikely that Saleh's testimony would have altered the outcome at trial. The government provided solid foundation for the charges, including the motive to stop a competitor, testimony from a co-conspirator, and contemporaneous phone records between Saleh and others in the conspiracy. Saleh's proposed testimony was unlikely to counter the government's evidence on its own.

*Trial counsel's decision not to call Richard Sanchez was reasonable trial strategy*

Saleh claims that his counsel was ineffective because they failed to call Richard Sanchez, an alleged co-conspirator in the arson, as a witness. ECF No. 143, at 9. The Second Circuit has stated that Courts should be "especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury." *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005). "The decision not to call a particular witness is typically a question of trial strategy," and "counsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." *Id.* Trial counsel's decision not to call Sanchez is objectively reasonable, as Sanchez may have given testimony that provided more information on Saleh's role in the conspiracy. Saleh's petition does not reference exculpatory facts that Sanchez could have testified about, and if Saleh's claim that Sanchez harbored a grudge against him for reporting Sanchez to the police for selling drugs is true (ECF No. 143, at 42), trial counsel may have reasonably concluded that Sanchez's testimony could be damaging.

Turning to the second prong of an ineffective assistance claim, it is unlikely that Sanchez's testimony would have affected the outcome of the jury's verdict. Defense counsel specifically tried to argue that the government's case was flawed without testimony from

Sanchez. Tr. 588-589. The jury still entered a guilty verdict, which suggests that further testimony from Sanchez was not necessary for them to reach a verdict.

*Saleh's "new found evidence" claims are without merit*

Finally, Saleh's supplemental habeas petition at ECF No. 148 asserts that he has uncovered "new found evidence" relevant to his case. This evidence appears to primarily be the United States Constitution, the Articles of Confederation, and an Affidavit from Saleh denying his guilt. The "new found evidence" does not include new factual evidence or testimony related to the charges. Saleh claims that the evidence is new because he personally was not familiar with the Constitution and "was not brought up in a type of schooling system that . . . could have [taught] me about the United States Constitution, until my further research after conviction." ECF No. 148 at 1.

The Court finds these arguments without merit. The Second Circuit has held that new evidence to sustain a habeas petition must rely on "newly discovered evidence that could not reasonably have been discovered before trial." *Helmsley*, 985 F.2d at 1206. Though Saleh may have been unfamiliar with the protections of the Constitution, he was represented by two experienced counsel, convicted by a jury of his peers before an experienced federal district judge, and his conviction was affirmed by the Second Circuit. The Second Circuit held that the evidence in his case was sufficient to support the conviction, and we do not find any grounds to vacate his conviction.

**CONCLUSION**

As laid out in the sections concerning petitioner's ineffective assistance of counsel claims, Mr. Saleh has not made a substantial showing of the denial of a constitutional right. Therefore, a certificate of appealability shall not be granted. *See Hoffler v. Bezio*, 726 F.3d 144, 154 (2d Cir. 2013); *Tankleff v. Senkowski*, 135 F.3d 235, 241 (2d Cir. 1998); *Rodriquez v. Scully*, 905 F.2d 24, 24 (2d Cir. 1990).

For the reasons stated above, Saleh's petition for a writ of habeas corpus is DENIED. Saleh's motions for compassionate release pursuant to 18 USC 3582(c)(1)(A)(i) were denied by this Court on February 7, 2022 at 18cr26, ECF No. 156. Therefore, the Clerk of Court is respectfully directed to terminate the following motions:

- 18cr26: ECF Nos. 142, 143, 148 and 153
- 20cv10535: ECF No. 11

The Clerk of Court is also directed to enter this opinion and order in the related case at 20-CV-10535 and mail a copy of this order to the petitioner.

**SO ORDERED.**

**Dated:**   **New York, New York**
  **December 15, 2022**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**